THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| R. WAYNE KLEIN, as Receiver,<br><br>        Plaintiff,<br>v.<br><br>AMBER L. BENNETT, an individual,<br><br>        Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART RECEIVER'S MOTION FOR SUMMARY JUDGMENT**<br><br> Case No. 2:19-cv-00703-DN-PK<br><br> District Judge David Nuffer<br> Magistrate Judge Paul Kohler |

This is an ancillary action to *United States v. RaPower-3, LLC et al.*,

2:15-cv-00828-DN-DAO (D. Utah) ("Civil Enforcement Case"), brought by Plaintiff R. Wayne

Klein, the Court-Appointed Receiver ("Receiver") of RaPower-3, LLC ("RaPower"),

International Automated Systems Inc. ("IAS"), LTB1, LLC ("LTB1"), their subsidiaries and

affiliates,[1] and the assets of Neldon Johnson ("Johnson") and R. Gregory Shepard ("Shepard").[2]

In the Civil Enforcement Case, the Receivership Entities were found to be operated as an abusive

tax fraud to enable funding for Johnson and his family. The Receiver's Complaint in this case

asserts seven causes of action against Defendant Amber L. Bennett to recover commission

payments made to her by the Receivership Entities for the sale of solar lenses to customers,

which perpetuated and expanded the Receivership Defendant's fraudulent scheme.[3]

---

[1] Collectively, unless stated otherwise, RaPower, IAS, LTB1, and all subsidiaries and affiliated entities are referred to herein as "Receivership Entities." The subsidiaries and affiliated entities are: Solco I, LLC ("Solco"); XSun Energy, LLC ("XSun"); Cobblestone Centre, LC ("Cobblestone"); LTB O&M, LLC; U-Check, Inc.; DCL16BLT, Inc.; DCL-16A, Inc.; N.P. Johnson Family Limited Partnership; Solstice Enterprises, Inc.; Black Night Enterprises, Inc.; Starlite Holdings, Inc.; Shepard Energy; and Shepard Global, Inc.

[2] Collectively, RaPower, IAS, LTB1, Shepard, and Johnson are referred to herein as the "Receivership Defendants."

[3] Complaint, docket no. 2, filed Sept. 27, 2019.

The Receiver seeks summary judgment on his First, Second, and Third causes of action arguing the transfers to Amber L. Bennett are voidable because they were made with actual or constructive fraud.[4] The Receiver also seeks summary judgment on his Sixth and Seventh causes of action seeking disgorgement of the commissions paid to Amber L. Bennett for the sale of unregistered securities by Amber L. Bennett, who was not properly licensed to sell securities.

Summary judgment in favor of the Receiver and against Amber L. Bennett is appropriate on the Receiver's First, Sixth, and Seventh causes of action. The Receiver's Second, Third, Fourth, and Fifth causes of action are moot. Therefore, the Receiver's Motion for Summary Judgment[5] is GRANTED in part.[6]

---

[4] Receiver's Motion for Summary Judgment, docket no. 24, filed Dec. 17, 2020.

[5] *Id.*

[6] The Receiver was directed to prepare and file a proposed memorandum decision and order granting in part the Receiver's Motion for Summary Judgment in compliance with DUCivR 54-1(b). Docket Text Order, docket no. 29, filed Mar. 8, 2021. Amber L. Bennett was served with the Receiver's proposed memorandum decision and order on March 22, 2021. Notice of Filing Proposed Order at 2, docket no. 30, filed Mar. 22, 2021. Under DUCivR 54-1(b), Amber L. Bennett had seven days to file an objection to the form of the proposed memorandum decision and order. No objection was filed. Therefore, any objection is waived. DUCivR 54-1(b).

# TABLE OF CONTENTS

UNDISPUTED MATERIAL FACTS ............................................................................................ 4

The Receivership Defendants' fraudulent scheme ...................................................... 4

The Civil Enforcement Case against the Receivership Defendants ............................ 8

Amber L. Bennett's involvement with the Receivership Defendants ....................... 10

Financial condition of certain Receivership Entities ................................................ 11

DISCUSSION .......................................................................................................................... 13

Judicial notice of the findings in the Civil Enforcement Case is allowed and those findings may be used in this ancillary proceeding ...................................................... 14

The Receiver is entitled to summary judgment on his voidable transfer claim because the transfers were made with actual intent to hinder, delay, or defraud ......................... 16

The Receiver has standing to assert claims to avoid transfers ............................... 16

The transfers are avoidable because they were made with actual intent to hinder, delay, or defraud creditors ...................................................................................... 18

The Receivership Defendants did not receive reasonably equivalent value in return for the transfers to Amber L. Bennett ...................................................................... 20

The Receiver is entitled to summary judgment on his securities claims ................... 22

The solar lens purchase program constitutes a security because it is an investment contract 23

Amber L. Bennett violated securities laws by selling unregistered securities without being licensed ........................................................................................................ 26

The Receiver is entitled to disgorgement of the commissions paid to Amber L. Bennett..... 27

The Receiver's Fourth cause of action for unjust enrichment is moot ...................... 28

The Receiver is entitled to prejudgment interest ...................................................... 28

ORDER ................................................................................................................................... 28

## UNDISPUTED MATERIAL FACTS[7]

### The Receivership Defendants' fraudulent scheme

1.      Johnson claimed to have invented solar energy technology, which involves solar lenses placed in arrays on towers.[8]

2.      To make money from this purported technology, Johnson sold a component of the technology: the solar lenses.[9]

3.      Through a multi-level marketing model (using affiliated entity RaPower), lenses were sold to hundreds of investors across the nation.[10]

4.      IAS or RaPower agreed to build solar towers and install the customers' lenses at a site determined by IAS or RaPower.[11]

5.      When customers purchased lenses, the customers also signed an operations and maintenance agreement with LTB1, with LTB1 agreeing to operate and maintain the customers' lenses to produce revenue.[12]

6.      LTB1 was to make quarterly payments to the lens purchasers, representing a portion of the revenues earned from the operation of the solar lenses.[13]

---

[7] Those facts, or portions thereof, identified in the parties' briefing that do not appear in these Undisputed Material Facts are either disputed; not supported by cited evidence; not material; or are not facts, but rather, are characterization of facts or legal argument. Additionally, self-serving and conclusory assertions within an affidavit or declaration are not accepted for purposes raising a genuine dispute of a material fact. *Hall v. Bellman*, 935 F.2d 1106, 1111 (10th Cir. 1991).

[8] Findings of Fact and Conclusions of Law ("FFCL") ¶¶ 2-3 at 2, ECF no. 467 in Civil Enforcement Case, filed Oct. 4, 2018, docket no. 24-2, filed Dec. 17, 2020.

[9] *Id*. ¶ 27 at 6.

[10] *Id*. ¶¶ 44 at 8, 49 at 9.

[11] *Id*. ¶¶ 124 at 23, 126 at 23, 133 at 24, 144-145 at 26.

[12] *Id*. ¶¶ 16 at 4, 150-152 at 27.

[13] *Id*. ¶ 153 at 27.

7.      No customer ever decided to buy a lens and then lease it to an entity other than LTB1.[14]

8.      Customers never took direct physical possession of their lenses. Because the Receivership Defendants did not track which lens belonged to which customer, there was no way for a customer to know which specific lens they owned. No customer has provided testimony that the owned lenses could be identified.[15]

9.      A bonus incentive program paid commissions or referral fees to persons who persuaded others to purchase solar lenses.[16] This program was offered to lens owners who were early participants with RaPower and promised to provide large bonuses when energy production became profitable. The program is different from the RaPower commission structure.[17]

10.     Johnson illustrated his idea as follows:[18]



---

[14] Id. ¶ 336 at 64.

[15] Id. ¶¶ 337-338 at 64. This fact is not disputed by Amber L. Bennett's subjective belief that a serial numbering system was used to associate lenses with owners. Declaration of Amber L. Bennett in Opposition to Wayne Klein's Motion for Summary Judgment ("Bennett's Declaration") ¶ 3 at 2, docket no. 27-2, filed Feb. 19, 2021. Rather, her belief relates to the disputed issue of good faith, resolution of which is not necessary for determination on the Receiver's Motion for Summary Judgment.

[16] FFCL ¶¶ 28-30 at 6.

[17] Bennett's Declaration ¶ 4 at 2.

[18] FFCL ¶ 292 at 57.

11.     Johnson's entities retained the lenses and controlled what happened to them (if anything).[19]

12.     The Receivership Defendants emphasized how little any customer would have to do with respect to "leasing out" their lenses: "[s]ince LTB[1] installs, operates and maintains your lenses for you, having your own solar business couldn't be simpler or easier."[20]

13.     The Receivership Defendants knew that they sold solar lenses to individuals who generally work full-time jobs, like teachers, school administrators, coaches, and others. They knew, or had reason to know, that their customers do not have special expertise in the solar energy industry.[21]

---

[19] *Id*. ¶ 339 at 64.

[20] *Id*. ¶ 340 at 64.

[21] *Id*. ¶¶ 350-351 at 67.

14.     The Receivership Defendants advertised substantial returns and tax benefits in exchange for only a down payment on the solar lenses:[22]



15.     The lens purchase program that Amber L. Bennett solicited others to purchase was not registered as a security with the United States Securities and Exchange Commission or the Utah Division of Securities.[23]

---

[22] Plaintiff's Trial Exhibits 496, 497, and 777 in Civil Enforcement Case, docket no. 24-3, filed Dec. 17, 2020.

[23] Receiver's Declaration in Support of Motion for Summary Judgment ("Receiver's Declaration") ¶¶ 4-5 at 3-4, docket no. 24-4, filed Dec. 17, 2020.

**The Civil Enforcement Case against the Receivership Defendants**

16.     On November 23, 2015, the United States filed the Civil Enforcement Case against the Receivership Defendants alleging that they were operating a fraudulent solar energy scheme.[24]

17.     In the Civil Enforcement Case, the court found: "For more than ten years, the Receivership Defendants promoted an abusive tax scheme centered on purported solar energy technology featuring 'solar lenses' to customers across the United States. But the solar lenses were only the cover story for what the Receivership Defendants were really selling: unlawful tax deductions and credits."[25]

18.     The Receivership Defendants sold solar lenses emphasizing their purported tax benefits. Customers were told that they could "zero out" their federal income tax liability by buying enough solar lenses and claiming both a depreciation deduction and solar energy tax credit for the lenses.[26]

19.     The purported solar energy technology and solar lenses, however, did not work and could not generate marketable energy. Specifically, the court found that the "purported solar energy technology is not now, has never been, and never will be a commercial-grade solar energy system that converts sunlight into electrical power or other useful energy" and "[t]he

---

[24] Complaint for Permanent Injunction and Other Equitable Relief, ECF no. 2 in Civil Enforcement Case, filed Nov. 23, 2015.

[25] Memorandum Decision and Order on Receiver's Motion to Include Affiliates and Subsidiaries in Receivership ("Affiliates Order") ¶ 1 at 4, ECF no. 636 in Civil Enforcement Case, filed May 3, 2019; docket no. 24-5, filed Dec. 17, 2020.

[26] FFCL ¶ 203 at 35.

solar lenses do not, either on their own or in conjunction with other components, use solar energy to generate [marketable electricity]."[27]

20.     None of these solar lenses ever met the necessary elements to qualify for depreciation deductions or the solar energy tax credit. Indeed, "[h]undreds, if not thousands" of customer lenses were not even removed from the shipping pallets.[28]

21.     Notwithstanding the fact the solar lenses and technology never worked, the Receivership Defendants continued to sell solar lenses to customers emphasizing that customers would qualify for depreciation deductions and/or the solar energy tax credit. Between 45,205 and 49,415 solar lenses were sold to customers.[29]

22.     The Receivership Defendants' own transaction documents and testimony at trial in the Civil Enforcement Case showed that the gross receipts received by the Receivership Defendants were at least $32,796,196 and possibly much more.[30]

23.     Based on these facts and others, the court enjoined the Receivership Defendants in the Civil Enforcement Case from promoting their abusive solar energy scheme; ordered them to disgorge their gross receipts; and required them to turn over their assets and business operations to the Receiver.[31]

24.     The court found that the "whole purpose of RaPower, IAS, and LBT1 . . . was to perpetuate a fraud to enable funding for Neldon Johnson. The same is true for other entities

---

[27] *Id*. ¶¶ 261-264 at 49. This fact is not disputed by Amber L. Bennett's assertion that she has seen the technology work. Bennett's Declaration ¶ 5 at 2. Amber L. Bennett also asserted that she knew that RaPower and IAS had not sold electricity on the energy market and believed they were making progress through research and development and were on the verge of creating electricity on a marketable scale. *Id*. ¶ 2 at 1-2.

[28] FFCL ¶¶ 288 at 55, 407-413 at 81-83.

[29] *Id*. ¶¶ 79 at 14, 261-264 at 49.

[30] *Id*. ¶¶ 80-86 at 15.

[31] Affiliates Order ¶ at 4; Memorandum Decision and Order Freezing Assets and to Appoint a Receiver ("Freeze Order"), ECF no. 444 in Civil Enforcement Case, filed Aug. 22, 2018, docket no. 24-6, filed Dec. 17, 2020.

Johnson created, controls, and owns . . . . Johnson has commingled funds between these entities, used their accounts to pay personal expenses, and transferred Receivership Property to and through them in an attempt to avoid creditors."[32]

25.     "Here, the whole purpose of RaPower[] was to perpetrate a fraud to enable funding of the unsubstantiated, irrational dream of Nel[d]on Johnson. The same is true for the other entities Johnson established and used including IAS, SOLCO I, XSun Energy, Cobblestone, and the LTB entities."[33]

26.     "[The Receivership] Defendants have no legitimate business, [the Receivership] Defendants' solar energy scheme is an abusive tax scheme and not a legitimate business."[34]

27.     "[The Receivership] Defendants do not have any revenue or income aside from the sale of solar lenses."[35]

### Amber L. Bennett's involvement with the Receivership Defendants

28.     Amber L. Bennett acted as a salesperson for the Receivership Entities and sold solar lenses for depreciation deductions or solar energy tax credits.[36]

---

[32] Affiliates Order ¶ 2 at 4-5; FFCL at 128; Receiver's Report and Recommendation on Inclusion of Affiliates and Subsidiaries in Receivership Estate ("Receiver's Report and Recommendation") §§ B.4-5, B.7, B.10-13, F.4-5, F.7, F.10-13, ECF 581 in Civil Enforcement Case, filed Feb. 25, 2019. "Receivership Property" means "all property interests of each of the Receivership Defendants . . . . These property interests include, but are not limited to: monies, accounts, trusts, funds, digital currencies, securities, credits, stocks, bonds, effects, goods, chattels, intangible property (including patents and other intellectual property), real property, lands, premises, leases, claims, rights, ownership interests in domestic or foreign entities, and other assets, together with rents, profits, dividends, receivables, interest, or other income attributable thereto, of whatever kind, that the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly." Corrected Receivership Order ¶ 13.a at 7, ECF no. 491 in Civil Enforcement Case, filed Nov. 1, 2018.

[33] FFCL at 128 (footnote omitted).

[34] Freeze Order at 18.

[35] *Id*. at 19.

[36] Receiver's Declaration ¶¶ 6-7 at 4. This fact is not disputed by Amber L. Bennett's subjective beliefs regarding the purported solar technology or her motivation for earning money. Bennett's Declaration ¶ 7 at 2. Rather, her beliefs and motivations relate to the disputed issue of good faith, resolution of which is not necessary for determination on the Receiver's Motion for Summary Judgment.

29.     Amber L. Bennett received commissions from the Receivership Entities for these sales from 2013 to 2018 in the amount of $7,161.00.[37]

30.     Amber L. Bennett was not licensed under state or federal securities law to sell securities.[38]

### Financial condition of certain Receivership Entities

**IAS**

31.     IAS was a public company and filed annual reports that included audited financial statements. The most recent annual report filed by IAS was for 2016. In that report, IAS indicated that it had $0.00 of revenue for the most recent fiscal year.[39]

32.     IAS indicated that as the date of its annual report for 2016, it had "not marketed any commercially acceptable products" and "will continue to need additional operating capital either from borrowing or from the sale of additional equities."[40]

33.     IAS also indicated that "[s]ince inception, we have incurred operating losses each year of our operations and we expect to continue to incur operating losses for the next several years. We may never become profitable."[41]

34.     As of June 30, 2016, IAS indicated that it had accumulated deficits of $40,156,398 with only $3,997,445 in total assets.[42]

---

[37] Receiver's Declaration ¶¶ 6-7 at 4; Defendant Amber L. Bennett's Responses to R. Wayne Klein's First Set of Discovery Requests ("Discovery Responses") at 2 (Response to Request for Admission No. 1), docket no. 27-1, filed Feb. 19, 2021.

[38] Discovery Responses at 6 (Response to Request for Admission No. 13).

[39] IAS Annual Report for Fiscal Year Ended June 30, 2016 at 2, docket no. 24-8, filed Dec. 17, 2020.

[40] *Id*. at 12.

[41] *Id*. at 15.

[42] *Id*. at 21-22.

35.     IAS's annual report for 2016 also states that "[t]he accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company has suffered recurring losses from operations that raises a substantial doubt about its ability to continue as a going concern."[43]

**RaPower**

36.     RaPower's revenue came from the sale of solar lenses.[44]

37.     Johnson's technology never generated marketable electricity or revenue from the sale of power.[45]

38.     The obligation of investors to make payments from the purchase of the solar lenses (beyond the initial down payment) was conditioned on receiving income from the use of the lenses in producing solar power.[46]

39.     RaPower was liable to lens purchasers to refund the purchase price for lenses if customers wanted their money back.[47]

---

[43] *Id*. at 37.

[44] FFCL at 87, ¶¶ 50 at 9, 79 at 14. This fact is not disputed by Amber L. Bennett's subjective belief that RaPower's revenues included investments made by Johnson and other individuals. Bennett's Declaration ¶ 8 at 3. Rather, her beliefs relate to the disputed issue of good faith, resolution of which is not necessary for determination on the Receiver's Motion for Summary Judgment.

[45] FFCL at ¶¶ 292-315 at 57-60. This fact is not disputed by Amber L. Bennett's assertion that she has seen the technology generate heat and was aware of the solar lenses generating measurable electricity. Bennett's Declaration ¶ 9 at 3. Amber L. Bennett also asserted that she knew that RaPower and IAS had not sold electricity on the energy market and believed they were making progress through research and development and were on the verge of creating electricity on a marketable scale. *Id*. ¶ 2 at 1-2. That she was told the technology was used to lower electrical costs at the facilities used by RaPower and at a grocery store for U-Check, *Id*. ¶ 9 at 3, relates to the disputed issue of good faith, resolution of which is not necessary for determination on the Receiver's Motion for Summary Judgment.

[46] FFCL at 99, 101, 115-116, ¶ 20 at 5, ¶¶ 143-171 at 26-29, ¶¶ 329-334 at 63.

[47] *Id*. at 102, 114-116, ¶ 135 at 24, ¶ 171 at 29, ¶¶ 330-334 at 63, ¶ 360 at 69-70.

## DISCUSSION

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[48] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way"[49] or "if a reasonable jury could return a verdict for the nonmoving party."[50] A fact is material if "it is essential to the proper disposition of [a] claim."[51] And in ruling on a motion for summary judgment, the factual record and all reasonable inferences drawn therefrom are viewed in a light most favorably to the nonmoving party.[52]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[53] If the moving party carries this initial burden, the nonmoving party "may not rest upon mere allegations or denials of [the] pleading[s], but must set forth *specific facts* showing that there is a *genuine issue* for trial as to those dispositive matters for which it carries the burden of proof."[54] "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient to defeat a properly supported motion for summary judgment."[55]

---

[48] Fed. R. Civ. P. 56(a).

[49] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[50] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (internal quotations omitted).

[51] *Adler*, 144 F.3d at 670.

[52] *Id.*

[53] *Id.* at 670-71.

[54] *Universal Money Ctrs., Inc.*, 22 F.3d at 1529 (internal quotations and citations omitted; emphasis in original).

[55] *Id.* (internal quotations omitted).

**Judicial notice of the findings in the Civil Enforcement Case is allowed
and those findings may be used in this ancillary proceeding**

Amber L. Bennett challenges the Receiver's use of findings of fact from the Civil

Enforcement Case, arguing that she "was not a party to the lawsuit between the IRS and the

Receivership Defendants and what was decided in that case cannot be binding on Defendant."[56]

While the facts from the Civil Enforcement Case are not binding on Amber L. Bennett, they can

be used by the Receiver as evidence to form a basis for his summary judgment motion for two

reasons.

First, this action—along with other actions brought by the Receiver—arose directly from

the Civil Enforcement Case.[57] The orders in the Civil Enforcement Case and their findings

provide the basis for the existence of the receivership, including findings that Receivership

Defendants promoted and operated an abusive tax scheme centered on purported solar energy

technology; that the solar energy technology did not work; and that the Receivership Defendants

had no legitimate business. These findings were made against the Receivership Defendants after

a 12-day bench trial and have been affirmed by the Tenth Circuit Court of Appeals.[58]

In the receivership context, courts routinely use findings made as to receivership entities

in proceedings against third parties.[59] The ability of district courts to use such findings is an

important tool in receiverships because the findings reduce the time necessary to settle disputes,

---

[56] Defendant's Opposition to Wayne Klein's Motion for Summary Judgment ("Response") at 5, 7-11, docket no. 27, filed Feb. 19, 2021.

[57] General Order No. 19-003, Oct. 18, 2019 (D. Utah).

[58] FFCL at 1; *United States v. RaPower-3, LLC*, 960 F.3d 1240, 1243 (10th Cir. 2020).

[59] This is usually done through summary proceedings in the underlying actions. In these types of cases, prior findings are used in proceedings involving third parties who were not defendants in the underlying action. *SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992) (non-parties presented evidence as to whether certain transfers were fraudulent but previous findings of securities violations and Ponzi-type scheme in underlying case were accepted in summary proceedings); *United States v. RaPower-3, LLC*, No. 2:15-CV-00828-DN, 2020 WL 5531563, at *1 (D. Utah Sept. 15, 2020) (citing prior findings in underlying action in order for turnover against a third-party).

decrease litigation costs, avoid duplication of work, and avoid inconsistent decisions.[60] The use of appropriate findings from the underlying action avoids the expense, distraction, and complexity of relitigating undisputed—and appeal-affirmed—findings. This is one of the reasons district courts have broad discretion in their supervisory role over equity receiverships involving numerous parties and complex transactions.[61]

Second, judicial notice of factual findings in the Civil Enforcement Case under Federal Rule of Evidence 201 is appropriate. In the summary judgment context, federal courts may "take judicial notice, whether requested or not, of its own records and files, and facts which are part of its public records."[62] "Judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it."[63] The Tenth Circuit has affirmed the use of judicial notice for a district court's prior factual findings in a closely related matter.[64] In *Amphibious Partners, LLC v Redman*, the Tenth Circuit held that the district court's judicial notice of its prior memorandum of order and judgment from a previous, related case was permitted and provided "no cause to disturb the district court's evaluation of the evidence."[65]

---

[60] *Elliott,* 953 F.2d at 1566 (citing *SEC v. Wencke,* 783 F.2d 829, 837 (9th Cir. 1986)). These reasons are also why all actions arising from the Civil Enforcement Case were ordered to be heard by the District Judge that presided over the Civil Enforcement Case. General Order, No. 19-003.

[61] *SEC v. Vescor Capital Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010) (district courts have "broad powers and wide discretion to determine relief in an equity receivership."); *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005); *Fed. Trade Comm'n v. Noland*, No. CV-20-00047-PHX-DWL, 2020 WL 4530459, at *7 (D. Ariz. Aug. 6, 2020) (discussing the need to avoid distracting satellite litigation in a receivership).

[62] *St. Louis Baptist Temple v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("a district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they would be utilized at trial."); *Anderson v. Cramlet*, 789 F.2d 840, 845 (10th Cir. 1986); *Van Woudenberg v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001); *United States v. Ahidley*, 486 F.3d 1184, 1192 (10th Cir. 2007).

[63] *St. Louis Baptist Temple*, 605 F.2d at 1172 ("federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

[64] *Amphibious Partners, LLC v. Redman*, 534 F.3d 1357, 1361-62 (10th Cir. 2008).

[65] *Id*.

Amber L. Bennett has not presented facts or evidence to dispute the findings in the Civil Enforcement Case or to question their accuracy, beyond her unsupported subjective beliefs. Therefore, judicial notice of the facts from the Civil Enforcement Case is appropriate and is taken.

### The Receiver is entitled to summary judgment on his voidable transfer claim because the transfers were made with actual intent to hinder, delay, or defraud

The Receiver seeks summary judgment on his First, Second, and Third causes of action under the Uniform Voidable Transactions Act ("UVTA").[66] The Receiver seeks summary judgment on his First cause of action because the transactions were made with "actual intent to hinder, delay, or defraud any creditor of the debtor."[67] The Receiver seeks summary judgment on his Second and Third causes of action based on constructive fraud.[68] Summary judgment in favor of the Receiver and against Amber L. Bennett on the Receiver's First cause of action—finding the transfers were made with "actual intent to hinder, delay, or defraud"—is appropriate. The Receiver's Second and Third causes of action are moot.

**The Receiver has standing to assert claims to avoid transfers**

Amber L. Bennett challenges the Receiver's ability to bring claims under the UVTA, arguing the Receiver has not identified a creditor of the Receivership Defendants.[69] The UVTA allows a creditor remedies to avoid a transaction.[70] The Receiver, who is the receiver of the

---

[66] The UVTA became effective on May 9, 2017. The governing law prior to the UVTA was the Uniform Fraudulent Transfer Act. The statutes are substantially similar; any differences do not affect the disposition of the Receiver's Motion for Summary Judgment. The statutes are referred to collectively herein as the UVTA, but citations to both statutes are given.

[67] Utah Code Ann. § 25-6-202(1)(a); Utah Code Ann. § 25-6-5(1)(a) (2016).

[68] Utah Code Ann. §§ 25-6-202(1)(b), 25-6-203(1); Utah Code Ann. §§ 25-6-5(1)(b), 25-6-8 (2016).

[69] Response at 18-19.

[70] Utah Code Ann. § 25-6-202(3).

assets of Receivership Defendants, has standing to bring the claims of the Receivership Defendants as a creditor.

The Tenth Circuit has recognized that a business entity abused by a fraudulent scheme qualifies as a defrauded creditor.[71] In doing so, the Tenth Circuit adopted the reasoning of *Scholes v. Lehmann*[72] that the transferor corporations were creditors "because the corporations had been 'evil zombies' under the defendant's 'spell,' they had been injured."[73] This analysis has also been recognized in the District of Utah.[74]

Here, the Receiver stands in the shoes of the defrauded Receivership Entities. These entities were "evil zombies" under the control of Johnson, who used the entities for his own purposes. Indeed, the "whole purpose of RaPower, IAS, and LBT1 . . . was to perpetuate a fraud to enable funding for Neldon Johnson. The same is true for other entities Johnson created, controls, and owns . . . . Johnson has commingled funds between these entities, used their accounts to pay personal expenses, and transferred Receivership Property to and through them in an attempt to avoid creditors."[75] "[T]he whole purpose of RaPower[] was to perpetrate a fraud to enable funding of the unsubstantiated, irrational dream of Nel[d]on Johnson. The same is true for the other entities Johnson established and used including IAS, SOLCO I, XSun Energy, Cobblestone, and the LTB entities."[76]

---

[71] *Klein v. Cornelius*, 786 F.3d 1310, 1316 (10th Cir. 2015).

[72] 56 F.3d 750 (7th Cir. 1995).

[73] *Cornelius*, 786 F.3d at 1317 (quoting *Scholes*, 56 F.3d at 754).

[74] *Klein v. Michelle Turpin & Assocs., P.C.,* No. 2:14-cv-00302-RJS-PMW, 2016 WL 3661226, at *5 (D. Utah July 5, 2016).

[75] Affiliates Order ¶ 2 at 4-5; FFCL at 128; Receiver's Report and Recommendation §§ B.4-5, B.7, B.10-13, F.4-5, F.7, F.10-13.

[76] FFCL at 128 (footnote omitted).

Because the Receiver stands in the position of the defrauded Receivership Entities, the Receiver has standing and the ability to assert fraudulent transfer claims on behalf of the Receivership Entities.

**The transfers are avoidable because they were made with actual intent to hinder, delay, or defraud creditors**

Pursuant to the UVTA, a transfer is voidable if the debtor (here, the Receivership Entities) made the transfer with "actual intent to hinder, delay, or defraud *any* creditor of the debtor."[77] To determine if a transfer is made with actual intent to hinder, delay, or defraud, courts look at a variety of factors, including the badges of fraud set forth in § 202 of the UVTA.[78] Courts also examine the knowledge of the transferors and the purpose of the transfer.[79]

In *In re Independent Clearing House Co.*, the district court examined transfers made by a fraudulent business entity, operating as a Ponzi scheme.[80] The district court held that the debtor knew "from the very nature of his activities" that creditors would lose money and that the business was not legitimate.[81] As a result of this knowledge, the only inference possible was that the transfers were made with actual intent to hinder, delay, or defraud creditors.[82]

A similar finding is appropriate in this case based on the Undisputed Material Facts. Each transfer made to Amber L. Bennett was payment for her bringing in additional purchasers of solar lenses.[83] The purchase of solar lenses was the primary component of the Receivership Defendants' fraudulent tax scheme. The "whole purpose of . . . the Receivership Entities . . . was

---

[77] Utah Code Ann. § 25-6-202(1)(a) (emphasis added); Utah Code Ann. § 25-6-5(1)(a) (2016).

[78] Utah Code Ann. § 25-6-202(2).

[79] *In re Independent Clearing House Co.*, 77 B.R. 843 (D. Utah 1987).

[80] *Id.*

[81] *Id.* at 860.

[82] *Id.*

[83] Discovery Responses at 2 (Response to Request for Admission No. 1).

to perpetuate a fraud to enable funding for Neldon Johnson. The same is true for other entities Johnson created, controls, and owns . . . . Johnson has commingled funds between these entities, used their accounts to pay personal expenses, and transferred Receivership Property to and through them in an attempt to avoid creditors."[84]

At this time, insolvency and a Ponzi Scheme has not been found in this case. However, the Receivership Defendants did not conduct a legitimate business. The Undisputed Material Facts demonstrate that the selling of solar lenses perpetuated and expanded the Receivership Defendants' fraudulent scheme. Amber L. Bennett was paid commissions by the Receivership Defendants for selling the solar lenses. Therefore, Amber L. Bennett's conduct and the payments made to her perpetuated and expanded the Receivership Defendant's fraudulent scheme. The only reasonable inference from the Undisputed Material Facts and record evidence is that the transfers to Amber L. Bennett were made with actual intent to hinder, delay, and defraud creditors of the Receivership Defendants. "[T]he question of intent to defraud is not debatable" where the Receivership Entities were operated as a fraudulent scheme.[85]

Additionally, actual intent to defraud may be inferred based upon the consideration of badges of fraud, including those set forth in Utah Code Ann. § 25-6-202(2).[86] Several factors exist that compel a finding of actual intent to hinder, delay, or defraud in this case, including:

- The Receivership Defendants had been sued or threatened with suit as the Internal Revenue System began a criminal investigation of the Receivership Defendants in June 2012, and the Department of Justice commenced the Criminal Enforcement Action in November 2015;[87]

---

[84] *Id.* (citing FFCL; Receiver's Report and Recommendation).

[85] *In re Independent Clearing House*, 77 B.R. at 861 (quoting *Conroy v. Shott*, 363 F.2d 90, 91-91 (6th Cir. 1966)).

[86] *RES-NV CHLV, LLC v. Rosenberg*, No. 2:13-cv-00115-DK, 2015 WL 423284 (D. Utah Feb. 2, 2015).

[87] Utah Code Ann. § 25-6-202(2)(d); Freeze Order at 16 (footnotes omitted).

- The Receivership Defendants had no legitimate business, and had not received any revenue or income aside from the sale of solar lenses;[88]

- The Receivership Defendants have removed or concealed assets and records;[89]

- The Receivership Defendants falsified documents to cover up their fraud;[90]

- The Receivership Entities did not receive reasonably equivalent value in return for the transfers.[91]

The Receiver has produced sufficient evidence of the badges of fraud. Amber L. Bennett has failed to adequately dispute those badges of fraud, instead asserting only her own purported good faith. Therefore, based on the Undisputed Material Facts and record evidence, the transfers to Amber L. Bennett were fraudulent as a matter of law.

**The Receivership Defendants did not receive reasonably equivalent value in return for the transfers to Amber L. Bennett**

Because the transfers were made to Amber L. Bennett with actual intent to hinder, delay, or defraud, the burden shifts to Amber L. Bennett to show that the good faith defense applies because (1) she took the transfers in good faith, and (2) for reasonably equivalent value.[92] The Receiver does not allege Amber L. Bennett did not act in good faith in receiving the transfers.[93] Therefore, for purposes of the Receiver's Motion for Summary Judgment, this requirement is presumed to be met. The issue is whether the Receivership Defendants received reasonably equivalent value.

---

[88] Freeze Order at 18-19.

[89] Affiliates Order at 55; Memorandum Decision and Order Granting Turnover Motion; Denying Motion to Strike; Overruling Objection to Authentication of Exhibits; and Overruling Objection to Rejection of Reputed Contract ("Turnover Order") at 45-47, ECF no. 1007 in Civil Enforcement Case, filed Sept. 15, 2020; Civil Contempt Order Re: Neldon Johnson, Glenda Johnson, LaGrand Johnson, and Randale Johnson at 5-9, 11-19, ECF no. 947 in Civil Enforcement Case, filed July 6, 2020.

[90] *Id*. at 8-9; Turnover Order at 41-42.

[91] *Infra* at 21-23.

[92] Utah Code Ann. § 25-6-304; Utah Code Ann. § 25-6-6(1) (2016).

[93] Receiver's Motion for Summary Judgment at 19 n.73.

"[I]n determining whether reasonably equivalent value was given, the focus is on whether the *debtor received* reasonably equivalent value from the transfer."[94] "In other words, the question is not whether [the transferee] 'gave reasonably equivalent value; it is whether [the debtor] received reasonably equivalent value.'"[95] Amber L. Bennett does not attempt to identify what benefit the Receivership Defendants received in exchange for the payments of commissions to her. Rather, she focuses only on what labor and services she performed in exchange for the transfers. This is immaterial. Because Amber L. Bennett does not identify any value received by the Receivership Defendants, her good faith defense fails as a matter of law.

Additionally, Amber L. Bennett could not have provided reasonably equivalent value in exchange for the commission payments as a matter of law. All of the transfers to Amber L. Bennett were payments of commissions for selling solar lenses to other investors. In *Wing v. Holder*, the receiver sought the return of referral fees paid to the defendant for bringing new investors into the fraudulent business.[96] The defendant argued that he provided reasonably equivalent value through his efforts of bringing in additional money from investors and answering questions from investors. The district court concluded that these efforts did not provide reasonably equivalent value to the fraudulent business. Rather, the defendant "essentially received money for prolonging the fraud of and on the [business entities]."[97] "It takes cheek to

---

[94] *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1276 (D. Utah 2015) (emphasis in original).

[95] *Michelle Turpin & Assocs., P.C.*, 2016 WL 3661226, at *7 (quoting *Klein v. Cornelius*, No. 2:11-cv-01159-DAK, 2013 WL 6008304, at *3 (D. Utah Nov. 13, 2013)).

[96] *Wing v. Holder*, No. 2:09-cv-00118-DB, 2010 WL 5021087 (D. Utah Dec. 3, 2010); *Miller v. Taber*, No. 1:12-cv-0074-DN, 2014 WL 317938 (D. Utah Jan. 28, 2014) (stating defendant must return commissions because he obtained them illegally); *Wing v. Buchanan*, No. 2:08-cv-00803-DB, 2014 WL 1516001 (D. Utah Apr. 18, 2014) (stating the investors have consistently been required to return commissions they received for finding new investors); *Klein v. Andres*, No. 2:11-cv-00656-TS, 2013 WL 4809260 (D. Utah Sep. 10, 2013) ("this and other courts have rejected similar claims that payments made as compensation for drawing in new investors to a Ponzi scheme constitute an exchange of reasonably equivalent value.").

[97] *Holder*, 2010 WL 5021087, at *2.

contend that in exchange for the payments he received the [fraudulent] scheme benefited from his efforts to extend the fraud by securing new investments."[98]

Commission payments paid to parties that promote a fraudulent scheme constitute fraudulent transfers and the recipients of the commission payments do not give reasonably equivalent value. Amber L. Bennett's sale of solar lenses further perpetuated the fraudulent tax scheme operated by the Receivership Defendants. Therefore, the Receivership Entities did not receive reasonably equivalent value as a matter of law.

Likewise, reasonably equivalent value was not provided because the payments to Amber L. Bennett were illegal since she was not licensed to sell securities.[99] Amber L. Bennett cannot assert any right to payment founded upon an illegal contract and for this reason reasonably equivalent value was not provided.[100]

The Receiver is entitled to avoid the transfers to Amber L. Bennett in the amount of $7,161.00. Judgment will be entered in the Receiver's favor and against Amber L. Bennett on the Receiver's First cause of action for this amount. The Receiver's Second and Third causes of action under the UVTA are moot.

### The Receiver is entitled to summary judgment on his securities claims

In addition to his claims under the UVTA, the Receiver also moves for summary judgment on his claims for violations of securities law because the securities sold by Amber L. Bennett were not registered and she was not licensed to sell securities. Utah and Federal law

---

[98] *Id.*

[99] *Infra* at 22-28.

[100] *Wing v. Dockstader*, No. 2:08-cv-00776-DB, 2010 WL 5020959, *6 (D. Utah Dec. 3, 2010) (finding reasonably equivalent value was not given because defendant was not licensed to sell securities).

require that securities be properly registered and prohibit the sale of unregistered securities.[101]

Utah and Federal law also prohibit an unlicensed person from selling securities.[102] It is

undisputed that the lens purchase program that Amber L. Bennett solicited others to purchase

was not registered as a security with the United States Securities and Exchange Commission or

the Utah Division of Securities[103] and that Amber L. Bennett was not licensed to sell

securities.[104] Therefore, if the lens purchase program is a security, Amber L. Bennett sold the lens

purchase program to others in violation of Utah and Federal law.

**The solar lens purchase program constitutes a security because it is an investment contract**

The Receiver argues that the lens purchase program constitutes a security because it is an

investment contract.[105] Amber L. Bennett argues that it is not a security because she was merely

selling a commodity—the solar lenses.[106] To determine whether the lens purchase program

constitutes a security, it is analyzed under the three-part test set forth in *S.E.C. v. Howey Co.*[107]

In *Howey*, the Supreme Court defined an investment contract as an agreement that involves

(1) an investment of money; (2) in a common enterprise; (3) with profits derived solely from the

---

[101] Utah Code Ann. § 61-1-7 ("It is unlawful for any person to offer or sell any security in this state unless it is registered under this chapter, the security or transaction is exempted under Section 61-1-14, or the security is a federal covered security for which a notice filing has been made pursuant to the provisions of Section 61-1-15.5.");15 U.S.C. § 77e(a), (e).

[102] Utah Code Ann. § 61-1-3 ("It is unlawful for a person to transact business in this state as a broker-dealer or agent unless the person is licensed under this chapter."); 15 U.S.C. § 78o(a).

[103] Receiver's Declaration ¶¶ 4-5 at 3-4.

[104] Discovery Responses at 6 (Response to Request for Admission No. 13).

[105] Receiver's Motion for Summary Judgment at 21-26.

[106] Response at 23-25.

[107] 328 U.S. 293 (1946).

efforts of others.[108] Applying this definition to the Undisputed Material Facts, the lens purchase program constitutes a security.

*Howey* involved the sales to investors of tracts of orange groves in Florida, combined with contracts to manage the orange groves for individual investors.[109] The Supreme Court held that the sale of the real property, combined with the management contracts, constituted an investment contract and was a security.[110] In so holding, the Supreme Court stated that the company offered more than fee simple interests in land, instead it offered "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents."[111] The Supreme Court noted that the common enterprise was a necessary part of the deal because the individual plots of land would not be economically feasible due to their small size, and only gain attractiveness when they are component parts of a larger operation managed by the respondent companies.[112] The orange groves in *Howey* were managed by an affiliated service company, which performed the labor of tending to the trees and harvesting and selling the oranges.[113] The investors also had no right to specific fruit; rather it was pooled by the company and the profits were to be provided to the investors.[114]

Each of the three elements of the *Howey* test is present here. Indeed, the structure of the lens purchase program and the structure of the orange grove program in *Howey* are substantially

---

[108] *Id.* at 298-99; Utah Code Ann. § 61-1-13 (defining "investment contract" as "an investment in a common enterprise with the expectation of profit to be derived through the essential managerial efforts of someone other than the investor").

[109] *Howey*, 328 U.S. at 295.

[110] *Id.* at 299.

[111] *Id.*

[112] *Id.* at 300.

[113] *Id.*

[114] *Id.* at 296.

similar. It is undisputed that the first element—an investment of money—is met. Amber L. Bennett argues the purchasers were merely purchasing a commodity—the solar lenses—and were not making an investment.[115] The same argument was made in *Howey*—that the purchasers were merely purchasing a fee simple interest in real property. The Supreme Court rejected this contention, finding they were purchasing "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents."[116]

Like in *Howey*, the investors were purchasing more than solar lenses. They were purchasing the right to receive tax credits and deductions and to share in profits of a solar lens operation managed by the Receivership Defendants. Indeed, the solar lens customers never took direct physical possession of their lenses.[117] Instead, as Amber L. Bennett concedes, the "the purchaser would lease the lenses to one of the Receiver Defendants who would then pay lease payments back to the owner of the lens."[118]

The second element—a common enterprise—is also present. To determine whether a common enterprise exists, courts examine the "economic reality of the transaction that occurred."[119] The "determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit."[120] The Receivership Defendants advertised substantial profits for only a down payment on the solar lenses.[121] Amber L. Bennett

---

[115] Response at 23-25.

[116] *Howey*, 328 U.S. at 296.

[117] FFCL ¶¶ 337-338 at 64

[118] Response at 23.

[119] *McGill v. American Land & Exploration Co.*, 776 F.2d 923, 925 (10th Cir. 1985).

[120] *Berrios-Bones v. Nexidis, LLC*, No. 2:07-cv-00193-CW, 2007 WL 3231549, *5 (D. Utah Oct. 30, 2007).

[121] Plaintiff's Trial Exhibits 496, 497, and 777 in Civil Enforcement Case.

also concedes the purchasers of solar lenses expected to profit from the purchase of lenses.[122]

The lenses would not be economically feasible on their own; the fortunes of the investors were

tied to the fortunes of the promoter in a common enterprise.

The presence of the third element—profits derived solely from the efforts of others—is

also indisputably present. The purchasers of solar lenses would sign an operations and

maintenance agreement with LTB1, with LTB1 agreeing to operate and maintain the customers'

leases to produce revenue.[123] The Receivership Defendants emphasized how little any customer

would have to do with respect to "leasing out" their lenses: "[s]ince LTB[1] installs, operates and

maintains your lenses for you, having your own solar business couldn't be simpler or easier."[124]

The Receivership Defendants knew that they sold solar lenses to individuals who generally work

full-time jobs, like teachers, school administrators, coaches, and others. They knew, or had

reason to know, that their customers do not have special expertise in the solar energy industry.[125]

The profits were to be derived solely from the efforts of LTB1. Therefore, the third element is

met.

Because each element of the *Howey* test is met, the lens purchase program constitutes an

investment contract and is a security.

### Amber L. Bennett violated securities laws by selling unregistered securities without being licensed

Because the lens purchase program constitutes a security, Amber L. Bennett was required

to be licensed to sell the security and the lens purchase program needed to be properly registered

as a security. It is undisputed that Amber L. Bennett was not licensed and that the lens purchase

---

[122] Discovery Responses at 4 (Response to Request for Admission No. 9).

[123] FFCL ¶¶ 16 at 4, 150-152 at 27.

[124] *Id*. ¶ 340 at 64.

[125] *Id*. ¶¶ 350-351 at 67.

program was not registered. And it is immaterial whether Amber L. Bennett knew that the lens purchase program constituted a security.[126]

Because Amber L. Bennett sold securities without being licensed under Utah or Federal securities laws, she violated Utah and Federal securities laws. And because the lens purchase program that Amber L. Bennett solicited others to purchase was not registered as a security with the United States Securities and Exchange Commission or the Utah Division of Securities, Amber L. Bennett violated Utah and Federal securities laws.

**The Receiver is entitled to disgorgement of the commissions paid to Amber L. Bennett**

Finally, the Receiver has standing and the ability to disgorge the commissions Amber L. Bennett received as a result of violating Utah and Federal securities laws. A receiver can recover commissions the defendant obtained illegally as a result of violations of securities laws.[127] "[Where t]he [d]efendants participated in a violation of law by selling [] securities without being properly licensed[, t]hey should not be allowed to benefit from the transactions."[128]

Additionally, the Receiver has standing because it stands in the place of the Receivership Entities that were defrauded. The Receivership Entities were "evil zombies" under the control of Johnson, who used the entities for his own purposes. Now that the Receiver has been appointed, he can seek disgorgement of the illegal commissions paid to Amber L. Bennett.

---

[126] *Cf. State v. Bushman*, 231 P.3d 833, 837 (Utah Ct. App. 2010) ("[A]dministrative sanctions under the Act do not require a finding of scienter or other mental state. Utah Code section 61-1-20 allows for the imposition of administrative sanctions . . . without regard to the violator's mental state. By contrast, Utah Code section 61-1-21 allows for criminal penalties for securities violations only for actions that are willful or knowing."); *State v. Wallace*, 124 P.3d 259, 262-263 (Utah Ct. App. 2005) ("Quite simply, knowledge by Defendant that the items sold were securities was not required to convict [Defendant] of willfully violating Utah Code section 61-1-3(1) and (2) and Utah Code section 61-1-7.").

[127] *Taber*, 2014 WL 317938 (stating defendant must return commissions because he obtained them illegally); *Dockstader*, 2010 WL 5020959 (because defendant was not licensed to sell securities, he cannot assert any right founded on an illegal contract).

[128] *Taber*, 2014 WL 317938, *3.

Therefore, the Receiver is entitled to disgorge the commission payments to Amber L. Bennett in the amount of $7,161.00. Judgment will be entered in favor of the Receiver and against Amber L. Bennett on the Receiver's Sixth and Seventh causes of action for this amount. The Receiver's Fifth cause of action for fraud in the offer and sale of securities is moot.

### The Receiver's Fourth cause of action for unjust enrichment is moot

Because judgment will be entered in favor of the Receiver and against Amber L. Bennett on the Receiver's First, Sixth, and Seventh causes of action in the amount of $7,161.00, the Receiver's Fourth cause of action for unjust enrichment is moot.

### The Receiver is entitled to prejudgment interest

The Receiver is entitled to an award of prejudgment interest.[129] Amber L. Bennett does not dispute the Receiver is entitled to prejudgment interest. For simplicity of calculation, prejudgment interest is awarded at the rate of 5% per annum[130] on the entire amount of $7,161.00 from the date the last transfer was received by Amber L. Bennett, which was April 18, 2018. The prejudgment interest that has accrued from April 18, 2018, through March 23, 2021, is $1,049.63.

### ORDER

IT IS HEREBY ORDERED that the Receiver's Motion for Summary Judgment[131] is GRANTED in part. Judgment will be entered in favor of the Receiver and against Amber L.

---

[129] *Wing v. Gillis*, 525 Fed. App'x 795, 801 (10th Cir. 2013) (upholding award of prejudgment interest to receiver because prejudgment interest "compensates for the loss of use of the money" and "[u]nder fairness and equity principles, prejudgment interest was proper"); *Miller v. Kelley*, No. 1:12-cv-00056-DN, 2014 WL 5437023 (D. Utah Oct. 27, 2014) (awarding prejudgment interest to receiver who obtained judgment under Utah's voidable transfers act); *Klein v. Widmark*, No. 2:11-cv-01097-CW, 2016 WL 845317 (D. Utah Mar. 2, 2016) (same).

[130] *Gillis*, 525 Fed. App'x at 801 (finding court did not abuse discretion in awarding prejudgment interest at the rate of 5%).

[131] Docket no. 24, filed Dec. 17, 2020.

Bennett on the Receiver's First, Sixth, and Seventh causes of action. The Receiver's Second, Third, Fourth, and Fifth causes of actions will be dismissed as moot.

The judgment entered in favor of the Receiver and against Amber L. Bennett will be for the $7,161.00 received in commissions by Amber L. Bennett, plus prejudgment interest in the amount of $1,049.63, and post judgment interest from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

The Clerk is directed to close the case.

Signed May 13, 2021.

BY THE COURT:

David Nuffer
United States District Judge